[Cite as *Merino v. Salem Hunting Club*, 2012-Ohio-4553.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| JAMES MERINO | ) | CASE NO. 11 CO 2 |
| | ) | |
| PLAINTIFF-APPELLANT | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| THE SALEM HUNTING CLUB, et al | ) | |
| | ) | |
| DEFENDANTS-APPELLEES | ) | |

CHARACTER OF PROCEEDINGS:          Civil Appeal from the Court of Common
                                   Pleas of Columbiana County, Ohio
                                   Case No. 05 CV 381

JUDGMENT:                          Affirmed in part.
                                   Reversed in part.

APPEARANCES:

For Plaintiff-Appellant:           Attorney John A. Burnworth
                                   Krugliak, Wilkins, Griffiths, Dougherty
                                   4775 Munson Street, N.W.
                                   P.O. Box 36963
                                   Canton, OH  44735-6963

For Defendants-Appellees:          Atty. K. Bret Apple
                                   243 North Lincoln Avenue
                                   Salem, OH  44460

JUDGES:

Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

                                   Dated:  September 28, 2012

[Cite as *Merino v. Salem Hunting Club*, 2012-Ohio-4553.]
WAITE, P.J.

{¶1} Appellant James Merino appeals the decision of the Columbiana County Court of Common Pleas to award attorney fees to Appellee, The Salem Hunting Club ("Club"). This is the second time this matter has been before us on appeal. In our first appellate review, we determined that there were material facts in dispute as to Appellant's claims of qualified nuisance and negligence, and that summary judgment in favor of the Club was not appropriate. The case was remanded for trial on these matters. Appellant did not prevail at trial, and Appellee subsequently filed a claim pursuant to R.C. 2323.51 for attorney fees based on alleged frivolous conduct by Appellant. The trial court awarded the requested fees, leading to this appeal. Appellant argues that Appellee's motion for fees was untimely filed, and also contends that his claims were not frivolous based on his good faith reliance on the report of an expert witness and on our prior Opinion in this matter finding that there were genuine issues of material fact in dispute. Appellant is incorrect that the motion for fees was not timely filed, but we agree that his conduct was not frivolous, particularly since we found in Appellant's favor in the prior appeal and remanded the case for trial. *Merino v. Salem Hunting Club*, 7th Dist. No. 07 CO 16, 2008-Ohio-6366 (*Merino I*). The judgment of the trial court is hereby reversed.

## BACKGROUND

{¶2} Appellant owns property at 1069 Benton Road, Salem, Ohio, adjacent to the Club. On January 17, 2003, Appellant filed a complaint against the Club. He voluntarily dismissed the complaint on April 13, 2004, and refiled the action on April 8, 2005. He raised claims sounding in trespass, nuisance per se, qualified nuisance,

and negligence. The trial court granted summary judgment to the Club on May 2, 2007, on all claims. Appellant filed the first appeal in this matter.

**{¶3}** We ruled in *Merino I* that based on the record, genuine issues of material fact existed with respect to the qualified nuisance and negligence claims. We noted that the evidence presented by Appellant's expert witness, Mr. Daniel Clevenger, "does at least create a genuine issue of material fact as to whether the Club breached its duty of care by failing to prevent bullets from escaping from its property." *Id.* at ¶36. We concluded that "[s]ummary judgment was not appropriate in this case as there exists genuine issues of material fact as to whether the configurations of the shooting ranges at the Club created, 'potentially or unreasonably dangerous conditions to exist,' * * * and whether Appellant came to the nuisance or has seen it escalate to the point of being actionable." *Id.* at ¶39.

**{¶4}** On remand, the case proceeded to a bench trial. Appellant presented testimony from four witnesses and introduced a number of exhibits. After Appellant rested his case, the Club requested that the judge issue a directed verdict. The Club's request was granted. On July 30, 2010, the trial court filed its judgment entry dismissing the complaint with prejudice. The trial court found that Appellant "failed to prove an essential element of his claim in that [his] own expert on the design and maintenance of a shooting range indicated he was not able to state an opinion that the Hunting Club was negligent in its operation of its shooting range. He further testified that the fact that some bullets may have ricocheted from protective mounds on [the Club's] property onto [Appellant's] property did not amount to negligence." (7/30/10 J.E., p. 2.)

**{¶5}**   On August 30, 2010, the Club filed a motion for attorney fees pursuant to R.C. 2323.51.  The motion alleged that Appellant engaged in frivolous conduct by failing to produce an expert witness who could testify that the Club was negligent. The Club requested attorney fees in the amount of $8,381.25 and expert witness fees totaling $4,346, extending back to expenses incurred from the original filing of the case in 2003.  Appellant responded to the motion by arguing that the defendant could not recover fees that occurred from the original complaint because it was voluntarily dismissed and because the motion for fees was not filed within 30 days of the voluntary dismissal.  Appellant cited R.C. 2323.51(B)(1) in support.  Appellant also argued that his litigation could not be considered frivolous because he did obtain an expert who was expected to testify as to negligence, based on the expert's prior report and affidavit, and that this Court had already held that his expert evidence raised genuine issues of material fact in dispute that required a trial.  Appellant maintains that he should be able to rely on his expert witness evidence and on our ruling in *Merino I* at least to the extent that he has established that his claims were not frivolous, even though he did not ultimately prevail at trial.

**{¶6}**   A hearing was held on the motion for fees on November 15, 2010.  The trial court issued its judgment on December 17, 2010.  The court denied the expert witness fees because it did not find any evidence that those fees were reasonable. The court granted the attorney fees request of $8,381.25, on the grounds that Appellant "present[ed] no evidence of negligence," and that "[w]ithout such evidence the Court finds his '[C]onduct consists of allegations or other factual contentions that have no evidentiary support....' O.R.C. 2323.51(B)(1)(a)(iii)."  (12/17/10 J.E., p. 5.)

{¶7} On January 14, 2011, Appellant filed a stay of execution of the judgment, which was granted by the trial court.

{¶8} The Club has failed to file a brief on appeal. We may "accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action." App.R. 18(C).

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN AWARDING ATTORNEY FEES FOR A CASE DISMISSED IN 2004, WHERE THE APPELLEE FAILED TO TIMELY REQUEST ATTORNEY FEES UNDER REVISED CODE 2323.51(B)(1).

{¶9} Appellant first submits that the Club was required to submit a request for fees relating to the originally filed complaint within thirty days of the voluntary dismissal of that complaint on April 13, 2004. Appellant points to R.C. 2323.51.(B)(1), which states: "[A]t any time not more than thirty days after the entry of final judgment in a civil action or appeal, any party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal. The court may assess and make an award to any party to the civil action or appeal who was adversely affected by frivolous conduct, as provided in division (B)(4) of this section." Appellant contends that the motion for fees, filed on August 30, 2010, was over six years too late and should have been denied. We do not agree.

{¶10} A trial court has sound discretion to determine whether to award sanctions under R.C. 2323.51, and its decision will not be reversed absent an abuse

of discretion. *State ex rel. Striker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, 957 N.E.2d 19, ¶10-11. To prove an abuse of discretion, the appellant must establish that the decision was unreasonable, arbitrary, or unconscionable. *Id.* at ¶11.

**{¶11}** R.C. 2323.51(B)(1) limits a party from filing a motion for frivolous conduct more than thirty days after "final judgment." The Ohio Supreme Court has construed the word "judgment" in an earlier version of R.C. 2323.51(B)(1) to mean a judgment that consists of a final appealable order. *Soler v. Evans, St. Clair & Kelsey*, 94 Ohio St.3d 432, 436, 763 N.E. 2d 1169 (2002). Not every complaint that is filed, though, ends with a final judgment or final appealable order. There is no final judgment when a case is voluntarily dismissed. A case that has been voluntarily dismissed is treated as though it had never been filed. *Zimmie v. Zimmie*, 11 Ohio St.3d 94, 95, 464 N.E.2d 142 (1984). Consequently, a voluntary dismissal pursuant to Civ.R. 41(A) does not adjudicate the merits of a claim, does not produce a prevailing party, and does not end in a final appealable order. *Champion Mall Corp. v. Bilbo Freight Lines, Inc.*, 81 Ohio App.3d 611, 615, 611 N.E.2d 969 (1992).

**{¶12}** We are aware that some courts have been asked to decide whether the time limit in R.C. 2323.51(B)(1) applies when a case has been voluntarily dismissed and no further action is taken in the case. *See, e.g., Baker v. AK Steel,* 12th Dist. No. CA2005-07-188, 2006-Ohio-3895. Although a voluntary dismissal, in and of itself, is not a final judgment, it has been treated at times as an event that triggers the running of the time limit to file a motion for frivolous conduct fees in order to enforce the spirit, if not the letter, of R.C. 2323.51(B)(1). The issue before us, however, is how to apply the thirty-day filing limit in R.C. 2323.51(B)(1) when a case has been

voluntarily dismissed and then refiled under the saving statute, R.C. 2305.19. The saving statute allows for the refiling of a case one year after it has been voluntarily dismissed.

{¶13} When a complaint is refiled under the saving statute, the case relates back to the date of the original complaint for purposes of satisfying any statute of limitations problems. The events being litigated are those that relate to the original filing. When the refiled case terminates, it terminates with respect to both the original filing and the refiled case. We see no reason why a motion for attorney's fees for frivolous conduct under R.C. 2323.51 should not relate back to the original filing, since the cause of action itself relates back to the original filing. The triggering event for starting the 30-day time period in R.C. 2323.51 is a "final judgment," and the date of final judgment of the negligence and nuisance claims in this case was July 30, 2010. That date should trigger the time limit for the filing of frivolous conduct fees for any alleged frivolous conduct.

{¶14} This comports with the reasoning in our Opinion in *Olivito v. Cavanaugh*, 7th Dist. Nos. 90-J-33, 90-J-39, 1992 WL 398435 (Dec. 30, 1992). *Olivito* was relied on by the Supreme Court in its *Soler* decision. *Soler* involved a multi-party lawsuit where plaintiff dismissed voluntarily his remaining claims against defendants after some defendants had been dismissed from suit in summary judgment. Once plaintiff dismissed, defendants filed a motion for attorney fees based on plaintiff's allegedly frivolous suit, but plaintiff claimed this motion was time-barred as to the defendants who had earlier been granted summary judgment, because

more than 21 days (under an earlier version of R.C. 2323.51) had lapsed as to these defendants. The Supreme Court explained its reliance on *Olivito* as follows:

> *Olivito* found that the statutory language supports the conclusion that a party is not required to wait until the end of the litigation to file a motion for sanctions. However, *Olivito* found that it is not necessary that the moving party always file the motion within twenty-one days of the entry of any judgment that could pertain to frivolous conduct. Instead, *Olivito* believed that the statutory language gives the moving party some discretion in deciding when to file the motion. Thus, *Olivito* found that the statute permits the moving party to file the motion at any time prior to the start of the trial or within twenty-one days after the entry of judgment, but that the term "judgment" should be interpreted as being synonymous with the term "final order" as defined in R.C. 2505.02.

*Soler* at 435.

{¶15} The Supreme Court accepted our reasoning and incorporated it into its holding: "We agree with the reasoning espoused in *Olivito*. The plain meaning of the statute provides a means for an immediate judicial determination and a speedy sanctioning of such abuse. However, the aggrieved party also has the option of waiting until the conclusion of the action to seek sanctions. Construing the word 'judgment' as used in the statute to mean a final appealable order serves the remedial purpose of the statute." *Id.* at 436.

{¶16} Thus, based on our earlier *Olivito* decision, as it is incorporated into *Soler*, we hold that parties may file for frivolous conduct fees at the earliest possible

moment, or they may wait until final judgment; the date the final appealable order is filed resolving all claims in the case. In the instant appeal, the initial voluntary dismissal did not trigger any final appealable order. The case was refiled, and the final appealable order was issued July 30, 2010, when the court granted a directed verdict. The motion for fees was filed within thirty days of the date of final judgment. The trial court correctly considered whether fees should be awarded from the date of the initial filing until the date of final judgment. Accordingly, Appellant's first assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN AWARDING ATTORNEY FEES FOR FRIVOLOUS CONDUCT, WHERE APPELLANT RELIED ON AND PRESENTED COMPETENT AND CREDIBLE EVIDENCE OF NEGLIGENCE.

**{¶17}** Appellant's second argument is that frivolous conduct fees should not have been awarded because he attempted to obtain appropriate expert witness evidence, and we were convinced that there were enough material facts in dispute to warrant remand of the case to the trial court for trial, as explained in *Merino I.* There is no argument from the Club in response. We accept Appellant's argument as reasonable and sustain his second assignment of error. We agree with Appellant that he should have been able to rely on our remand in *Merino I* as evidence that his litigation was not frivolous. Further, the Club has not filed a brief in this appeal to contradict Appellant's assertions that there were material questions of fact in dispute about the negligence claim, or that he presented evidence of negligence at trial. The

definition of frivolous conduct relied on by the trial judge under R.C. 2323.51(A)(2)(a)(iii) refers to allegations that have no evidentiary support or are not likely to have evidentiary support. This definition does not apply here. Despite the fact that Appellant's expert witness changed his testimony at trial, Appellant fully expected his expert witness to present the necessary evidence to support his negligence and nuisance claims at trial. Unfortunately, Appellant's expert changed his testimony at trial. Hence, the fact that Appellant survived summary judgment in the prior appeal and attempted to present that same evidence at trial should be proof that Appellant's claims were not frivolous, even though his evidence ultimately fell short. *Wrinch v. Miller*, 183 Ohio App.3d 445, 2009-Ohio-3862, 917 N.E.2d 348, ¶55 (9th Dist.).

**{¶18}** The trial court's decision to grant a directed verdict to the Club does not, in and of itself, justify the granting of fees under R.C. 2323.51. The decision to grant or deny a motion for directed verdict is not determinative of whether frivolous conduct occurred. *L & N Partnership v. Lakeside Forest Assn.*, 183 Ohio App.3d 125, 2009-Ohio-2987, 916 N.E.2d 500, ¶46 (10th Dist.).

**{¶19}** For all the aforementioned reasons, we sustain Appellant's second assignment of error.

## CONCLUSION

**{¶20}** Appellant has appealed the trial court's decision to grant Appellee fees for frivolous conduct pursuant to R.C. 2323.51. Appellant first argues that the Club filed the motion for fees too late, at least with respect to fees incurred prior to the refiling of the case in 2005. Appellant contends that the motion should have been

filed within thirty days of the voluntary dismissal of the first complaint on April 13, 2004. Based on our interpretation of R.C. 2323.51(B)(1) and the Ohio Supreme Court's ruling in *Soler*, along with our prior holding in *Olivito*, we conclude that the Club was permitted to wait until the date of final judgment to file for fees relating back to the original complaint in the case. Therefore, we overrule Appellant's first assignment of error.

{¶21} Appellant also argues that he should not have been assessed fees for frivolous conduct when he procured an expert witness who created a genuine dispute of material facts to overcome summary judgment, as this Court held when we remanded the case to the trial court in *Merino I*, and when this expert testified at trial, even though the expert changed his testimony. Based on this record, he did attempt to present evidence of negligence and qualified nuisance. Although Appellant did not ultimately prevail at trial in part because his expert did not testify entirely as expected, he did present some evidentiary support for his claims both at the summary judgment stage and at the trial itself. Therefore, his claims cannot be determined to be frivolous, and we sustain his second assignment of error. The judgment of the trial court is reversed as to the decision to grant attorney fees to the Club.

Vukovich, J., concurs.

DeGenaro, J., dissents; see dissenting opinion.

DeGenaro, J., dissenting:

**{¶22}** The trial court erred in awarding attorney fees incurred in the original action and I would reverse and vacate that award. But the trial court did not abuse its discretion in determining that Merino failed to provide evidentiary support for his claim at trial and awarding Salem Hunting attorney fees. Thus, I must respectfully dissent from the majority's disposition of both assignments of error.

**{¶23}** The first assignment of error raises an issue unresolved by the majority's opinion: when a party voluntarily dismisses a case under Civ.R. 41(A) but does not refile the case, what event triggers the statutory time limit for filing a sanctions motion under R.C. 2323.51? The majority notes that other appellate districts have addressed this question, but it concludes that the issue before us is only determining what triggers the time limit when a case has been voluntarily dismissed and then refiled within one year pursuant to R.C. 2305.19. Thus, the majority does not discuss the holdings of these other cases or their effect on the facts of this case. Although this case does not directly involve a voluntarily dismissed case that is not refiled, I believe a complete analysis cannot be made without reconciling the result of the case sub judice with the precedent set by our sister districts.

**{¶24}** Ohio courts have interpreted a Civ.R. 41(A) voluntary dismissal as the triggering event for filing a sanctions motion in order to enforce the legislative intent of R.C. 2323.51(B)(1). For example, the Twelfth District held that a motion for sanctions pursuant to R.C. 2323.51 filed nine months after the plaintiff voluntarily dismissed the case without prejudice was untimely. *Baker* at ¶ 26. The court reasoned: "In order to give effect to the legislative intent behind this statute, the time frame within which a R.C. 2323.51 motion for sanctions is filed cannot be perpetual. Thus, it would follow that a trial court may consider a motion for sanctions under R.C. 2323.51 following a Civ.R. 41(A) voluntary dismissal only where the motion is filed within the statutory deadlines." *Id.* at ¶ 25.

**{¶25}** Likewise, the Eighth District held that although the trial court's dismissal of the case without prejudice was not a final, appealable order, the defendant's motion for sanctions filed 40 days after the dismissal was untimely because it was not

filed within the statutory time limit. *Edwards v. Lopez*, 8th Dist. No. 95860, 2011-Ohio-5173, ¶ 10, 13.

{¶26} In concluding that a motion for sanctions under R.C. 2323.51 must be filed within the statutory time limit after a Civ.R. 41(A) voluntary dismissal, the courts in *Baker* and *Edwards* relied upon the Ohio Supreme Court's reasoning in *Soler*:

> By enacting R.C. 2323.51, the General Assembly sought to provide a remedy for those harmed by frivolous conduct. Yet, by the same token, the General Assembly manifested its intent that there be a cutoff time for this sanction to be imposed. This purpose is served by giving the aggrieved party the option of filing the sanctions motion at any time prior to trial or within twenty-one days of the last judgment rendered in the case. This would assure that twenty-one days after the entry of final judgment, the proceedings would be over.

*Id.* at 436.

{¶27} Here, Merino voluntarily dismissed the original action without prejudice pursuant to Civ.R. 41(A)(1)(a) on April 13, 2004 and refiled the case on April 8, 2005, almost one year later. Under the majority's analysis, the August 30, 2010 motion for attorney fees was timely because Salem Hunting filed it within 30 days of the final judgment in the refiled case, when the trial court granted the directed verdict. The majority concludes that the refiled case relates back to the original case for purposes of the statute of limitations.

{¶28} Yet under the majority's analysis, had Merino not refiled his case, there would be no final appealable order to trigger the filing limit for a sanctions motion. Unless the voluntary dismissal was treated as the triggering event as in *Baker* and *Edwards*, the need for a time limit in which a party may file a sanctions motion would be completely ignored. Another option for the triggering event could be the one year savings statute plus one day, although this solution is less sound when considering the need for a timely resolution of the issue. Thus, I agree with the *Baker* and *Edwards* holdings that a Civ.R. 41(A) voluntary dismissal is the event triggering the filing limit for a sanctions motion when the case is not refiled.

**{¶29}** But when considering the holdings in *Baker* and *Edwards* with the majority's holding, the results are difficult to reconcile. If a plaintiff voluntarily dismisses his case without prejudice, the defendant would not know if the case would be refiled or not within the one year savings statute. Thus, if a defendant filed his motion for sanctions within the filing limit after the voluntary dismissal, his motion would be timely. But if the defendant waited longer than 30 days to file his motion, then his motion may or may not be timely based upon whether the plaintiff chose to refile the case up to one year later. And if the plaintiff did refile the case, then the sanctions motion could be heard, as in the case sub judice, years after the frivolous conduct occurred in the original case.

**{¶30}** I believe that this result is impractical and does not conform to the legislative intent as discussed in *Soler*, *Baker*, and *Edwards*. Thus, I would follow the rationale of our sister districts and hold that a Civ.R. 41(A) voluntary dismissal, regardless of whether the case is refiled, is the triggering event for filing a sanctions motion under R.C. 2323.51. This holding would give effect to the legislative intent that there be a cutoff time for the sanctions to be imposed. Therefore, I would find that Salem Hunting's motion, filed well over 21 days after Merino voluntarily dismissed the original action without prejudice, exceeded the statutory time limit.[1] Accordingly, I would find that the trial court erred in awarding attorney fees incurred in the original action and I would reverse and vacate that award.

**{¶31}** Turning to the second assignment of error, I find that the trial court did not abuse its discretion in determining that Merino's conduct was frivolous and awarding attorney fees to Salem Hunting.

**{¶32}** To determine whether Merino properly supported his claims of negligence at trial, it is necessary to examine both the law on qualified nuisance claims and the evidence Merino presented at trial in an attempt to establish a qualified nuisance claim.

**{¶33}** In *Merino I*, this court set forth the applicable law regarding qualified nuisance claims:

---

[1] Under the former version of the statute applicable in 2004.

"Nuisance" is defined as, "the wrongful invasion of a legal right or interest." *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, 432, 55 N.E.2d 724. "Wrongful invasion" encompasses the use and enjoyment of property or of personal rights and privileges. *Id.*

A "private nuisance" is, "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 712, 622 N.E.2d 1153. Unlike a public nuisance, a private nuisance threatens only one or few persons. *Taylor,* supra, at 442, 55 N.E.2d 724, citing *McFarlane v. Niagara Falls* (1928), 247 N.Y. 340, 160 N.E. 391.

A private nuisance may be further designated as absolute or qualified:

"An absolute nuisance is based on either intentional conduct or an abnormally dangerous condition that cannot be maintained without injury to property, no matter what care is taken. A qualified nuisance is essentially a tort of negligent maintenance of a condition that creates an unreasonable risk of harm, ultimately resulting in injury." *State ex rel. R.T.G., Inc. v. State,* 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998, ¶ 59.

Strict liability is imposed when an absolute nuisance is found. *Taylor,* supra, at paragraph two of the syllabus; *State ex rel. Schoener v. Hamilton Cty. Bd. of Commrs.* (1992), 84 Ohio App.3d 794, 799, 619 N.E.2d 2. In contrast, "qualified" nuisance is premised upon negligence.

A qualified nuisance arises from a failure to exercise due care. *Taylor,* at 436, 55 N.E.2d 724. Thus, "[t]he allegations of nuisance and negligence therefore merge, as the nuisance claims rely upon a finding of negligence." *Allen Freight Lines, Inc. v. Consol. Rail Corp.* (1992),

64 Ohio St.3d 274, 276, 595 N.E.2d 855.

"In an action based upon the maintenance of a qualified nuisance, the standard of care is that care that a prudent man would exercise in preventing potentially or unreasonably dangerous conditions to exist; it is the same standard of care required of owners and occupiers of land toward business invitees." *Kramer v. Angel's Path, L.L.C.,* 174 Ohio App.3d 359, 2007-Ohio-7099, 882 N.E.2d 46, ¶23. The issue of reasonableness is an issue to be determined by the trier of fact. *Id.*

*Merino I* at ¶19-25.

**{¶34}** This court noted in *Merino I* that the Ohio Administrative Code provides that shooting ranges "should substantially comply with safety guidelines generally recognized and accepted by the national rifle association (NRA). Suggested safety guidelines are described or explained in great detail in 'The NRA Range Source Book, Section I, Chapter 2, (1999 Edition).'" O.A.C. 1501:31-29-03(D). *Id.* at ¶ 32.

**{¶35}** This court further explained that the violation of an administrative rule may be admissible as evidence of negligence. *Id.* at ¶ 33. It noted that Clevenger, Merino's expert, testified in his affidavit that the range backstops at Salem Hunting do not comply with the requirements in the NRA Range Source Book because "they consistently allow stray bullets to travel onto the Merino property, significantly increasing the risk of substantial harm to persons and property. Clevenger further stated in his affidavit that the bullets that either penetrated trees or came to rest on the Merino property did so in a pattern that indicates that the bullets came from the Club. *Id.* at ¶ 35. This court explained that while the NRA Range Source Book requirements are not specific and detailed enough to establish negligence per se, Clevenger's affidavit created a genuine issue of material fact regarding whether Salem Hunting "breached its duty of care by failing to prevent bullets from escaping from its property." *Id.* at ¶ 36.

**{¶36}** When the case proceeded to a bench trial on remand in 2010, Merino presented testimony from four witnesses, including his own testimony and expert testimony from Clevenger and William Ullom from Vadose Environmental

Consultants.

**{¶37}** Clevenger testified that he owns a shooting range, which he built in 2004; he constructed his range according to the guidelines in the NRA Range Source Book. He stated that the NRA Range Source Book recommended that backstops on outdoor ranges should be at a minimum 15 to 20 feet high and should be "erected in such a way to stop any rounds going off-property." He explained that he visited Merino's property approximately two years ago and he observed that there were two backstops that were not high enough to trap the rounds going off the range. However, he also stated that, "[a]t the end of the property there was a huge mound, probably forty, maybe forty-five feet high. * * * That would have stopped any rounds going off-property." Clevenger testified that he did not know when the large mound was constructed. He also explained that while he was on Merino's property, he did not see any evidence of bullets going over the backstop.

**{¶38}** On cross-examination, Clevenger testified that the intermediate mounds that were not high enough were located in the direction of the last mound at the back of the property such that the shooting took place in the direction of that mound. He confirmed that even though the intermediate mounds were not high enough, the last mound was high enough to catch any round that would have gone beyond the intermediate mounds.

**{¶39}** Clevenger confirmed that building the backstops is a "judgment call." The court asked him whether he felt that Salem Hunting was negligent in its construction of its backstops, and he responded that he could not say that Salem Hunting was negligent. The court also asked him whether the fact that the intermediate mounds were not high enough was inconsequential because of the high mound at the end of the property, and he replied that it was a difficult question to answer because bullets can ricochet on impact. He explained that even though the last mound was extremely high, it would not have trapped every round on the range because a bullet could ricochet off of a shorter mound and travel over the high mound. However, Clevenger acknowledged that even on his own range which has high backstops, bullets can ricochet and land in his trees. He confirmed that he does not consider himself negligent because of the occasional ricochet nor could he say

that Salem Hunting was negligent.

{¶40} Upon review, I find that unlike his statements in his affidavit which merely *raised* a genuine issue of material fact to survive summary judgment, Clevenger's testimony at trial does not provide any evidentiary support for Merino's qualified nuisance claim. As the trial court noted, Clevenger could not say that Salem Hunting was negligent in its construction of the backstops nor could he say that it was negligent because of the possibility of bullet ricochet. Further, Clevenger's trial testimony does not support the conclusion that Salem Hunting failed to substantially comply with the safety guidelines in the NRA Range Source Book. Although he testified that the intermediate backstops were not high enough to stop rounds from leaving the range, he testified that the high mound at the end of the property was high enough to stop any rounds from exiting the range, including those that the intermediate backstops would not stop.

{¶41} This court correctly relied on Clevenger's affidavit to determine that a genuine issue of material fact existed as to whether Salem Hunting breached its duty of care in the first appeal. However, Merino failed to present evidence at trial that the backstops were inadequate to protect adjacent property owners. In fact, Clevenger's testimony at trial was to the contrary, that the backstop along the back of the property was high enough.

{¶42} Merino also argues that Ullom's testimony regarding lead contamination on his property shows that bullets from Salem Hunting were traveling onto his property. Merino hired Ullom, an environmental consultant, to evaluate Merino's property for lead contamination in 2003. Ullom's firm tested soil and stream water samples from Merino's property. The results showed soil samples containing lead in concentrations exceeding the levels of lead hazardous to human health as defined in the Ohio Revised Code. Ullom explained that typically the highest concentration of contamination on a property occurs near the source of the contamination. On the Merino property, the highest concentration of lead in the soil was located adjacent to Salem Hunting's property. In addition, the stream water samples showed the highest lead concentration in the samples taken near the area where the highest soil lead concentrations were found.

**{¶43}** Ullom also confirmed that he was hired to perform the evaluation of the lead content on the property, not to determine the cause of the contamination. On cross-examination, Ullom explained that the lead contamination likely took years to reach the current level of contamination, but he did not have any data to determine how fast lead was applied to the property.

**{¶44}** While Ullom testified regarding the levels of lead contamination on Merino's property, he did not state an opinion that the contamination was due to bullets from Salem Hunting landing on Merino's property. Although Ullom's testimony that the lead concentration was highest near the Salem Hunting property line could support an inference that the lead contamination resulted from stray bullets from the Club, the trial court, as the trier of fact, did not make this inference. Since Ullom stated that he was not hired to determine causation, it was within the trial court's discretion, again, as the trier of fact, to conclude that Ullom's testimony was not evidence that Salem Hunting failed to exercise due care.

**{¶45}** Merino further contends that his own testimony is evidence of Salem Hunting's negligence. He described an incident where a horse was shot on his property approximately 25 years ago, and Salem Hunting paid for the veterinarian bills. He claimed that over the years, there has been an increase in shooting. He stated that he can hear the shooting and can hear the bullets ricochet through the trees on his property. He said that he has been in his woods and pellets have rained down on him from the skeet range. The last time he saw a bullet on his property was about six months ago; he was at the back of his property and a bullet flew through the trees.

**{¶46}** Merino identified his Exhibit 1 as a photograph he took of the shooting range from his property. He claimed that Salem Hunting had recently built up their backstop and it was approximately ten feet high in the photograph. Merino also introduced photographs that he took of Salem Hunting's no trespassing signs located on their property line. He explained that the signs contained bullet holes created by bullets going in the direction of his property. Next, he showed photographs of bullet marks in his trees located ten feet from his property line, which he stated were taken around August 2001. He also explained that he has found bullets in his trees using a

metal detector, and he introduced a photograph of a bullet imbedded in a tree that was cut down.  He explained that five to six ring growths surrounded the bullet.

**{¶47}** On cross-examination, Merino testified that Salem Hunting built up their backstop since he took the photograph marked as Exhibit 1 in August of 2001 or 2002.  He admitted that he has not taken photographs of bullet holes since the ones he took in 2001.

**{¶48}** While Merino did testify that he observed bullets landing on his property, Clevenger testified that some bullets could escape the range due to ricochet, but he could not say that Salem Hunting was negligent.  Furthermore, Merino's testimony is vague in general.  His exhibits showing evidence of bullet marks in his trees were taken in 2001, and he did not have any current pictures showing bullets on his land.  While he testified that Salem Hunting had recently increased the height of their backstop, his photograph showing the backstop, Exhibit 1, was taken in 2001 or 2002.  It is unclear when Salem Hunting raised their backstop to comply with the NRA Source Book, and, pertinent to this appeal, whether Salem Hunting raised the backstop before or after Merino initiated this matter.  The trial court, as the trier of fact, was in a better position to view Merino's testimony, judge his credibility, and weigh the evidence.  Thus, the trial court did not err in determining that this testimony was not evidence of negligence.

**{¶49}** The majority concludes that the fact that Merino survived summary judgment and attempted to present the same evidence at the bench trial via Clevenger's testimony is proof that Merino's claims are not frivolous.  I do not agree.  The majority cites to *Wrinch*, where the Ninth District found that "[a]lthough not determinative, the fact that summary judgment was denied demonstrates that Wrinch provided at least some factual basis to support the claims."  *Id.* at ¶ 55.  While in many cases survival of a summary judgment motion may demonstrate that the plaintiff's claims have some factual basis as the case proceeds past summary judgment, the facts and procedural posture of this case warrant a different result.

**{¶50}** On remand, this case proceeded as a bench trial, with the judge serving as the trier of fact.  After the close of Merino's case in chief, the trial court granted a directed verdict in favor of Salem Hunting.  The majority correctly notes that the trial

court's decision to grant a directed verdict is not itself determinative of the issue of frivolous conduct. However, the fact that the trial court granted a directed verdict is still a factor to consider when determining whether the trial court abused its discretion in finding Merino's conduct *on remand and the manner in which he prepared for and presented his case at trial* was frivolous. *See Baker v. Beachwood Villas Condominium Owners Ass'n*, 6th Dist. No. E-03-011, 2004-Ohio-682, ¶ 23 (trial court's denial of a directed verdict after appellant's case-in-chief is arguably a determination that appellant's claim was not frivolous). The trial court did not resolve this case after considering the credibility and weight of competing evidence from both parties. The case was resolved by determining that Merino wholly failed as a matter of law to present evidence on issues such as causation and whether Salem Hunting failed to exercise due care.

**{¶51}** Having survived summary judgment, it was incumbent upon Merino to prepare his case to sustain his burden of proof. The evidence that was presented at the bench trial must be put in context: Merino originally filed the action in 2003 and refiled it in 2005; after this court remanded the case in 2008, the matter proceeded to a bench trial in 2010. Merino's testimony was vague, and the photographic evidence he submitted was from 2001; as the trier of fact, the trial court could give this vague and stale evidence little or no weight.

**{¶52}** We held in the first appeal that Clevenger's affidavit, which stated that Salem Hunting's backstop was not high enough, was sufficient to establish a genuine issue of material fact regarding negligence *for summary judgment purposes.* Conversely, at trial, Clevenger testified that the approximately 40 foot high backstop along the back of the property in his opinion was high enough; he could not say that Salem Hunting was negligent. The NRA Range Source Book introduced at trial, suggested backstops should be at least 15-20 feet high. Thus, Merino presented no evidence *at trial* regarding whether or not Salem Hunting breached its duty of care.

**{¶53}** Ullom testified at trial that there was lead contamination on Merino's property, that it accumulated over a period of years, and that it was higher near the shooting range. But he was not asked by Merino to assess the cause of the lead contamination, and presented no testimony as to whether the contamination was

caused by stray bullets from Salem Hunting, either in whole or in part. Thus, Merino failed to present any evidence of causation *at trial*.

**{¶54}** For these reasons, I cannot say that the trial court's determination that Merino's conduct was frivolous was unreasonable. I would affirm this assignment of error.

**{¶55}** Accordingly, I dissent with respect to both assignments of error. The trial court erred in awarding attorney fees incurred in the original action and I would reverse and vacate that award. However, the trial court did not abuse its discretion in determining that Merino failed to support his claims at the bench trial and I would affirm the trial court's award of attorney fees for that frivolous conduct.