[Cite as *Zamlen-Spotts v. Keco*, 2019-Ohio-5048.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| JUDY K. ZAMLEN-SPOTTS, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2018-G-0186** |
| JOY KECO, | : | |
| Defendant-Appellee. | : | |

Civil Appeal from the Geauga County Court of Common Pleas, Case No. 2017 P 000822.

Judgment: Reversed and remanded.

*Mark S. O'Brien*, 2460 Fairmount Boulevard, Suite 301B, Cleveland Heights, Ohio 44106 (For Plaintiff-Appellant).

*Robert N. Farinacci*, 65 North Lake Street, Madison, Ohio 44057 (For Defendant-Appellee).


MARY JANE TRAPP, J.

{¶1} Appellant, Judy K. Zamlen-Spotts ("Ms. Zamlen-Spotts"), appeals the judgment of the Geauga County Court of Common Pleas finding that she engaged in frivolous conduct in her civil action against appellee, Joy Keco ("Ms. Keco"). She also appeals the trial court's judgment ordering her to pay $48,346.68 in attorney's fees and expenses to the extent they were incurred in relation to her previously dismissed civil action against Ms. Keco.

{¶2} We find that the trial court erred in determining Ms. Zamlen-Spotts engaged in frivolous conduct pursuant to R.C. 2323.51(A)(2)(a)(iii) and (iv). Contrary to popular opinion and despite efforts over the years to enact changes to the law, Ohio has long adhered to the "American rule" with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation. *Wilborn v. Bank One Corp.,* 121 Ohio St.3d 546, 2009-Ohio-306, ¶7, citing *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32, 33-34 (1987). While the General Assembly has provided for some exceptions to this general rule, including the so-called "frivolous conduct" statute, our state is not a "loser-pays" state.

{¶3} This case brings to mind two law school maxims: "bad cases make bad law" and "there are always three sides to every story." The jury in this case heard testimony about the common knowledge in Geauga County that Geauga Park District Board of Commissioners' meetings have engendered impassioned public comment, letters to the editor, and social media posts, along with the need to have a park ranger posted in order to "keep the peace." But when passion devolves into incivility, confrontation, and then allegations of wrongdoing, which lands the parties before a jury of their peers, and that jury decides the claimant did not prove the allegations by a *preponderance* of the evidence, case law demands sanctions for frivolous conduct in bringing the lawsuit must be based upon a *total* lack of supporting evidence.

{¶4} The frivolous conduct statute authorizes a trial court to sanction only if there is *no* evidentiary support. The legal test to be followed is whether the party has minimal evidentiary support for its allegations or factual contentions. In this case, the trial court

2

had two opportunities to dismiss the case by directed verdict if it found there was *no* evidence to support Ms. Zamlen-Spotts' claims. But at both points in the trial when it could have found in Ms. Keco's favor, it denied motions for directed verdict, stating "[a]fter hearing the testimony the Court cannot say that after construing it most strongly in favor of one side or the other that a reasonable jury could come to but one conclusion." The trial court necessarily found there was *some* evidence supporting each of Ms. Zamlen-Spotts' claims; enough evidence to give the jury an instruction of law on each claim and to allow the jury, as the trier of fact, to determine whom they believed.

{¶5} The record before us establishes that there was a negative interaction between Ms. Zamlen-Spotts and Ms. Keco during the public meeting. The record also establishes there was an altercation between Ms. Zamlen-Spotts and Ms. Keco after the public portion of the park district meeting. Ms. Keco admitted she approached Ms. Zamlen-Spotts and physically blocked her exit from the building with her arm in order to speak with her about allegations Ms. Zamlen-Spotts made to another about Ms. Keco and her friend, who was seated next to her at the meeting. Multiple witnesses did hear some "loud voices," described variously as a "commotion" or a "hub bub." On the evening of the incident Ms. Keco denied touching Ms. Zamlen-Spotts and said, "I should have beat the shit out of her, but, no, I didn't touch her." But at trial and despite the fact that a lawsuit was not filed against her until almost a year later, Ms. Keco explained "[t]he reason why I said that is because she is suing me for something I did not do and I never put a hand on her and then I said that because I was hot."

{¶6} Ms. Zamlen-Spotts produced some, albeit weak and exaggerated, evidentiary support for her allegations and factual contentions in the form of her own

3

sworn testimony, sworn testimony from other witnesses who observed her physical injuries as well as her physical and emotional state directly before and after the incident, documentary evidence, such as photographs and medical records, and expert medical testimony regarding the existence of her medical conditions. Most critically, her treating experts causally related her injuries to trauma from this incident.

{¶7}   Because we find there was no basis for sanctions, Ms. Zamlen-Spotts' second assignment of error is moot.

{¶8}   Thus, we reverse the judgment of the Geauga County Court of Common Pleas finding that Ms. Zamlen-Spotts engaged in frivolous conduct and remand for determination of costs to be awarded to Ms. Keco as the prevailing party pursuant to Civ.R. 54(D).

### Substantive History and Procedural Background

{¶9}   This case involves an alleged physical assault following a meeting of the Geauga Park District Board of Commissioners at the Meyer Center in Chardon, Ohio.

{¶10}   On April 14, 2015, Ms. Keco, a 73-year-old woman and a member of the Ohio Horseman's Council, attended a park board meeting with her friend, Elinor Stanton ("Ms. Stanton"). During the meeting, they were sitting behind a person who they later learned was Ms. Zamlen-Spotts. On two occasions during the meeting, Ms. Zamlen-Spotts turned around and gave Ms. Keco and Ms. Stanton mean looks. According to Ms. Zamlen-Spotts, they had disrupted the meeting by making rude comments about certain board members, calling Commissioner Gertz "senile" and Commissioner Mary Ruth Shumway "stupid." Ms. Keco and Ms. Stanton denied making any such comments. Ms.

4

Zamlen-Spotts, Ms. Keco, and Ms. Stanton did not know each other before this board meeting.

{¶11} After the meeting, the board members went into executive session, and many of the attendees left the meeting room and entered the reception area. While in the reception area, another attendee approached Ms. Keco and told her that Ms. Zamlen-Spotts was complaining that she and Ms. Stanton were making rude comments during the meeting.

{¶12} According to Ms. Keco, she approached Ms. Zamlen-Spotts as Ms. Zamlen-Spotts was leaving the building so she could ask her about the complaint. The women were inside the vestibule area leading outside the building. There were no others present in the vestibule during this encounter. The small vestibule has two sets of double doors—one set leading out of the reception area and the second set leading outside of the building. At the time of the encounter, Ms. Keco and Ms. Zamlen-Spotts were inside the vestibule area with the inside set of doors closed behind them.

{¶13} Seeing that Ms. Zamlen-Spotts was not going to stop to speak with her, Ms. Keco put her hand on the door jamb blocking Ms. Zamlen-Spotts' exit. Without touching Ms. Zamlen-Spotts, Ms. Keco asked why she was "trying to make trouble" for her and Ms. Stanton. Ms. Keco claims that Ms. Zamlen-Spotts threatened to call the park ranger if she did not take her arm down. According to Ms. Keco, she told Ms. Zamlen-Spotts to "just go." She then drove Ms. Stanton home, and they stopped for ice cream on the way.

{¶14} Ms. Zamlen-Spotts had a very different recollection of their encounter. According to Ms. Zamlen-Spotts, Ms. Keco "slammed" into her, making her head snap

5

back and causing her to see flashing lights. She also claimed Ms. Keco yelled at her while digging her thumbs into Ms. Zamlen-Spotts' arms, causing her right arm to "pop," and shook her. Eventually, Ms. Zamlen-Spotts was able to get away and leave the building.

{¶15} Ms. Zamlen-Spotts drove home and called Geauga Park District Ranger James Kailburn ("Ranger Kailburn"), and Commissioner Shumway to report the incident. Both arrived at her house shortly after the call. Ranger Kailburn took photographs of bruises and red marks on Ms. Zamlen-Spotts' arms.

{¶16} Ranger Kailburn spoke with Ms. Keco later that evening. She denied touching Ms. Zamlen-Spotts and made the "I should have beat the shit out of her" statement.

{¶17} Ranger Kailburn was on duty to "keep the peace" at the April 15 board meeting. He did not see any altercation and could not see the vestibule from where he was standing. During the investigation of the incident, no attendees saw physical contact between the two women, but some reported hearing "loud voices."

{¶18} After the visit by Commissioner Shumway and the ranger, Ms. Zamlen-Spotts went to the emergency room where she gave a history of being "grabbed by the arms and squeezed and then shook." She also reported being "punched with fists in the upper arms as well as verbally threatened." The physician noted "contusions on both arms and the "back of [the] right arm does have a small ecchymotic area and is tender." Ms. Zamlen-Spotts received x-rays of her shoulders, which did not demonstrate any injury. She was ultimately diagnosed with a concussion, acute cervical strain, bilateral shoulder pain, and contusions.

6

{¶19} The next morning, Diane Jones ("Ms. Jones"), a friend of Ms. Zamlen-Spotts, became concerned during a telephone call with her and called 911 on her behalf. Ms. Zamlen-Spotts was taken to the hospital in an ambulance, where she complained of a dislocated shoulder, headache, confusion, memory loss, nausea, vomiting, and right shoulder pain. She also received a CT scan of her head, which showed normal results. A few days later, Ms. Zamlen-Spotts obtained an MRI of her right shoulder upon orders of her primary care physician, which showed changes in the rotator cuff consistent with partial tearing or tendinitis.

{¶20} Ms. Zamlen-Spotts subsequently received treatments from several professionals, including her primary care physician, an ophthalmologist, an orthopedic surgeon, an occupational therapist, and a psychological counselor.

{¶21} After receiving various treatments to her right shoulder, Ms. Zamlen-Spotts continued to complain of pain. She consulted with Dr. Matthew Levy ("Dr. Levy"), a board-certified orthopedic surgeon, on June 1, 2015 and ultimately underwent surgery to repair conditions present in her shoulder, including a type two SLAP tear.

{¶22} Ms. Zamlen-Spotts filed a complaint against Ms. Keco in the Geauga County Court of Common Pleas under Case No. 16 P 000192 alleging that Ms. Keco "viciously attacked, assaulted and battered" her "without any provocation," "lunged" at her, and "beat" her "head, arms, and torso." Ms. Zamlen-Spotts further alleged that she sustained injuries, including "a severe right shoulder and rotator cuff injury," a "Type 2 right shoulder SLAP tear," "a concussion," "injuries to her eyes and resulting migraine headaches," and "psychological injuries." She asserted claims for relief of assault, battery, and intentional infliction of emotional distress.

7

{¶23} Shortly before trial was scheduled to begin, Ms. Zamlen-Spotts voluntarily dismissed her complaint because one of her expert witnesses was unavailable.

{¶24} Five days later, Ms. Zamlen-Spotts filed a second complaint against Ms. Keco under Case No. 17 P 000822, which contained similar allegations and the same three claims for relief of assault, battery, and intentional infliction of emotional distress.

{¶25} The case was ultimately tried to a jury over three days.

### Ms. Zamlen-Spotts' Case

{¶26} At trial, Ms. Zamlen-Spotts presented the testimony of Ms. Keco upon cross-examination, her own testimony, the deposition of Ms. Stanton, who had since passed away, the testimony of Ms. Shumway, Ranger Kailburn, and Ms. Jones, expert testimony from Justin Simons ("Mr. Simons"), a licensed professional clinical counselor, and videotaped medical testimony from Dr. Levy. She also presented photographs of her injuries, medical records, and invoices.

{¶27} At trial, Ms. Zamlen-Spotts testified regarding her own personal observations of Ms. Keco's alleged physical assault and abandoned the claims that Ms. Keco "beat" her "head," "arms," or "torso," as alleged in her complaint and the emergency room history. At trial she testified that as she was leaving the building, she heard her name being called, and she put her hand up and said "I am not interested. Leave me alone or I'll call the ranger." Then she claimed she was "slammed" into by someone in the portion of the lobby between the reception desk and the vestibule doors. According to Ms. Zamlen-Spotts, she then saw the person assaulting her was one of the women sitting behind her during the meeting. She claims Ms. Keco "grabbed her and pulled her forward," and she felt her right arm pop. Ms. Keco was shaking her and kept saying "you

8

are not going anywhere." Ms. Zamlen-Spotts testified that the Wohlkens were standing nearby, watching, but failed to respond to her call to summon the ranger. When they got to the door, Ms. Keco was blocking it so she could not get out. She also testified regarding medical and psychological symptoms, subsequent treatments, and her inability to work for a period of time.

{¶28} Because of her passing, Ms. Zamlen-Spotts offered Ms. Stanton's testimony from her deposition, the transcript of which was read into open court. Ms. Stanton generally confirmed Ms. Keco's version of events. She "understood" there had been a "confrontation" at the park board meeting. Ms. Stanton also confirmed that during the meeting, Ms. Zamlen-Spotts had turned around and "glared" at her on two occasions. She had been mingling with the attendees after the board went into executive session, and as she was making her way through the crowd, she saw Ms. Keco approach Ms. Zamlen-Spotts and speak with her. She said Ms. Zamlen-Spotts "didn't seem to want to be communicating with" Ms. Keco. Ms. Zamlen-Spotts "marched out the lobby doors." Ms. Keco followed her and "put her hand up like this to try to stop her." Ms. Stanton saw no contact between the two women and did not hear their interaction.

{¶29} Ms. Shumway testified regarding Ms. Zamlen-Spotts' report of being physically assaulted at the meeting, left in a voicemail message that she retrieved after leaving the meeting. Ms. Shumway and Ms. Zamlen-Spotts know each other from their work with Geauga County CASA (Court Appointed Special Advocate) program. She went to Ms. Zamlen-Spotts' house soon after the meeting adjourned, where she observed physical injuries to the upper arms and heard her complaint of right shoulder pain. Ms. Shumway confirmed that Ms. Zamlen-Spotts had complained to her at the meeting of the

two women making comments about Ms. Shumway and Mr. Gertz. She told Ms. Zamlen-Spotts to "forget it. Consider the source and move on." She also confirmed that Ms. Zamlen-Spotts did not appear to be suffering from any physical injuries when they spoke at the meeting and that she was "excited about the outcome of the meeting."

{¶30} As noted earlier, Ranger Kailburn testified that while he was present at the meeting, he did not personally observe any altercation between Ms. Zamlen-Spotts and Ms. Keco. He also testified regarding Ms. Zamlen-Spotts' subsequent report of being physically assaulted at the meeting and his visit to Ms. Zamlen-Spotts' house shortly after the meeting, where he observed physical injuries and took photographs. He stated that during the course of his investigation of the incident, no one he spoke to corroborated Ms. Zamlen-Spotts' version of events.

{¶31} Ms. Jones testified that during a telephone conversation with Ms. Zamlen-Spotts the day after the incident, Ms. Zamlen-Spotts was "incoherent" and her "words were slurred." She called for an ambulance to take Ms. Zamlen-Spotts to the hospital. She also testified regarding her personal observations of "massive," "purple" bruising on Ms. Zamlen-Spotts' arms.

{¶32} Dr. Levy testified regarding his treatment of Ms. Zamlen-Spotts' right shoulder, which began a month and a half after the incident, and his surgical repair of a type two SLAP tear. He opined, within a reasonable degree of medical probability or certainty, that the condition was caused by trauma, namely, an assault on April 14, 2015. When asked whether his surgical findings were caused by a trauma event or natural degenerative aging, he explained that the fraying he observed is degenerative, but the "peel back sign" was not caused by degeneration but was a "traumatic injury." Dr. Levy

10

also testified that there was no indication of any trauma to her shoulder after the date of the incident.

{¶33} Finally, Mr. Simons testified regarding his counseling sessions with Ms. Zamlen-Spotts. He initially diagnosed her with acute stress disorder, which he described as a reaction to an incident or a series of incidents that results in mental health symptoms of anxiety, depression, nightmares, and potentially flashbacks. He eventually changed his diagnosis to posttraumatic stress disorder, which he described as having more symptoms and being more severe than acute stress disorder. He opined, based on a reasonable degree of licensed professional clinical certainty, that Ms. Zamlen-Spotts' psychological conditions were caused by the incident of April 14, 2015.

{¶34} After the close of Ms. Zamlen-Spotts' case and the presentation of Ms. Keco's first witness, her medical expert, Dr. James Brodell ("Dr. Brodell"), who disputed that Ms. Zamlen-Spotts' injuries were caused by an assault, the trial court ruled on the admission of Ms. Zamlen-Spotts' exhibits. The trial court then observed, "Considering a motion for directed verdict would require me to determine based on the evidence I have heard that no reasonable jury could rule in favor of the plaintiff. Are you making such a motion Mr. Farinacci?" Ms. Keco' counsel then moved for a directed verdict, which the trial court denied.

### Ms. Keco's Defense

{¶35} In defense, Ms. Keco presented her own testimony, the expert medical testimony of Dr. Brodell, an orthopedic surgeon, as well as the testimony of James Wohlken ("Mr. Wohlken"), Kathleen Webb ("Ms. Webb"), Katherine Hanratty ("Ms. Hanratty"), and Joseph Koziol ("Mr. Koziol"), who all attended the park board meeting.

11

{¶36} Dr. Brodell opined, to a reasonable degree of medical certainty, that based on his review of Ms. Zamlen-Spotts' medical records, the conditions shown in the MRI of her right shoulder were not caused by an assault, and three of the conditions repaired during surgery were degenerative, age-related conditions that were not caused by an assault. He further opined that the type two SLAP tear was not the result of an assault but could have been caused by age, "marine-type" workouts (Ms. Zamlen-Spotts is a retired Marine), bench pressing, and pushups. He also suggested that the marks on Ms. Zamlen-Spotts' arms were self-inflicted. Dr. Brodell testified that "[n]one of the records have any evidence, if you will, of significant injury." Dr. Brodell did not examine Ms. Zamlen-Spotts nor did he review the actual x-ray or MRI films.

{¶37} Mr. Wohlken testified that as he walked outside the Meyer Center after the meeting, there was a "big hub bub." He observed a woman come through the door, turn her back towards the vestibule doors, and shout "You evil hags." He testified that the woman walked to her vehicle "very straight" and "almost like marching."

{¶38} Ms. Webb testified that at least 30 people were present in the lobby of the Meyer Center after the meeting and that she did not hear anything unusual that interrupted the conversation she was having in the lobby area.

{¶39} Ms. Hanratty testified that she did not recall Ms. Keco being disruptive during the meeting, but after the meeting she heard a "commotion" consisting of "voices raised" lasting five to ten seconds.

{¶40} Finally, Mr. Koziol testified that he did not notice any disruption from Ms. Keco during the meeting. After the meeting, he noticed a "raising of voices, a little commotion" for about "five seconds."

**{¶41}** At the close of her defense, Ms. Keco again moved for a directed verdict, which the trial court denied.

**{¶42}** Following deliberations, the jury returned its verdict finding in favor of Ms. Keco and against Ms. Zamlen-Spotts on all three claims for relief. The jury's votes on battery and intentional infliction of emotional distress were unanimous, while its vote on assault was seven to one.

### *Motion for Attorney Fees and Expenses*

**{¶43}** Following the trial, Ms. Keco filed a motion for attorney fees and expenses pursuant to Civ.R. 11 and R.C. 2323.51(A)(2)(a)(i), (iii), and (iv). The trial court held a hearing on the motion for sanctions, at which counsel presented argument, but the parties introduced no additional evidence.

**{¶44}** The trial court subsequently issued a judgment entry finding that by filing her complaint and testifying as she did, Ms. Zamlen-Spotts engaged in frivolous conduct pursuant to R.C. 2323.51(A)(2)(a)(iii) and (iv).[1] Specifically, the trial court found (1) at trial, "other than her own testimony," Ms. Zamlen-Spotts presented "no evidence whatsoever" that Ms. Keco attacked her and caused injury, (2) none of the witnesses who testified substantiated her claims of a physical assault, (3) Ms. Zamlen-Spotts presented "no testimony or evidence from anyone other than herself" that Ms. Keco caused her injuries.

**{¶45}** The trial court also found it to be "incredible" that "a person could be viciously and brutally attacked, grabbed by her arms and shaken back and forth, screamed at in the vestibule or entryway of the Meyer Center with more than thirty people

---

1. Although the trial court's citations contain typographical errors, it is clear the trial court intended to reference R.C. 2323.51(A)(2)(a)(iii) and (iv).

13

nearby without one single person seeing the assault or hearing the screams," and that "a person who had been viciously and brutally attacked would go to her car and leave; rather than return to the meeting room to report the attack to the Park Ranger, Geauga County Park Board members, and other persons present."

{¶46} The trial court determined that the conduct of Ms. Zamlen-Spotts' counsel was not shown to have been willful under Civ.R. 11.

{¶47} The trial court scheduled the matter for a further hearing to determine costs, attorney's fees and expenses, and whether an award should also be made against Ms. Zamlen-Spotts' counsel under R.C. 2323.51.

{¶48} At the subsequent hearing, Ms. Keco presented testimony and evidence regarding the costs and expenses she incurred.

{¶49} Following the hearing, the trial court issued a judgment entry ordering Ms. Zamlen-Spotts to pay Ms. Keco the sum of $48,346.68 for attorney's fees and expenses. It determined that the attorney's fees incurred in the first case that Ms. Zamlen-Spotts voluntarily dismissed were reasonably and necessarily related to Ms. Keco's defense in the second case. It also found it would not be appropriate to make Ms. Zamlen-Spotts' counsel responsible for payment of attorney fees or expenses.

{¶50} The trial court subsequently issued a nunc pro tunc judgment entry correcting its reference to the date the hearing was held.

{¶51} Ms. Zamlen-Spotts now appeals, asserting the following two assignments of error:

{¶52} "[1.] The trial court erred by determining that Plaintiff-Appellant engaged in frivolous conduct under O.R.C. §§ 2323.51(A)(2)(a)(iii) and (iv).

14

{¶53} "[2.] The trial court erred by ordering Plaintiff-Appellant to pay to Defendant-Appellee attorney's fees and expenses relating to an earlier case that was dismissed by Plaintiff-Appellant when Defendant-Appellee did not file a motion for sanctions under O.R.C. § 2323.51 within 30 days of Plaintiff-Appellant's dismissal of the earlier case."

### Frivolous Conduct

{¶54} Under her first assignment of error, Ms. Zamlen-Spotts contends the trial court erred in finding that she engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(iii) and (iv).

### *Standard of Review*

{¶55} An appellate court's standard of review of rulings pursuant to R.C. 2323.51 varies and is contingent upon the basis for the trial court's decision. (Citations omitted.) *Keith-Harper v. Lake Hosp. Sys., Inc.*, 11th Dist. Lake No. 2015-L-137, 2017-Ohio-7361, ¶23. A trial court's decision that conduct was frivolous under R.C. 2323.51(A)(2)(a)(iii) and (iv) is a factual determination. *See Grimes v. Oviatt*, 8th Dist. Cuyahoga No. 107122, 2019-Ohio-1365, ¶31. Some deference is appropriate in reviewing a trial court's factual determinations. *Stevenson v. Bernard*, 11th Dist. Lake No. 2006-L-096, 2007-Ohio-3192, ¶38. Therefore, we will not disturb the trial court's findings of fact if they are supported by competent, credible evidence. (Citation omitted). *Keith-Harper* at ¶24.

{¶56} This standard of review of factual determinations is similar to that employed in a review of the manifest weight of the evidence. *Stevenson* at ¶38, citing *Crooks v. Consol. Stores Corp.*, 10th Dist. Franklin No. 98 AP-83, 1999 WL 52981, *4 (Feb. 4, 1999). *See C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus

15

("Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence").

### R.C. 2323.51

{¶57} R.C. 2323.51 serves to deter abuse of the judicial process by penalizing sanctionable conduct that occurs during litigation. *Filonenko v. Smock Constr., LLC*, 10th Dist. Franklin No. 17AP-854, 2018-Ohio-3283, ¶14. The statute was designed to chill egregious, overzealous, unjustifiable and frivolous action. (Citations omitted.) *Ferron v. Video Professor*, Inc. 5th Dist. Delaware No. 08-CAE-09-0055, 2009-Ohio-3133, ¶45. In determining whether conduct is frivolous, courts must carefully apply the statute so that legitimate claims are not chilled. (Citation omitted.) *Id.*

{¶58} Pursuant to R.C. 2323.51(B)(1), "at any time not more than thirty days after the entry of final judgment in a civil action or appeal, any party adversely affected by frivolous conduct may file a motion for an award of court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with a civil action * * *." The award may be made "against a party, the party's counsel of record, or both." R.C. 2323.51(B)(4).

{¶59} "Conduct" includes, in relevant part, "[t]he filing of a civil action, the assertion of a claim, defense, or other position in connection with a civil action, the filing of a pleading, motion, or other paper in a civil action, * * * or the taking of any other action in connection with a civil action." R.C. 2323.51(A)(1)(a).

{¶60} "Frivolous conduct" means the conduct of a party or the party's attorney that satisfies any of the following:

16

{¶61} "(i) It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.

{¶62} "(ii) It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law.

{¶63} "(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

{¶64} "(iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief." R.C. 2323.51(A)(2)(a)(i) through (iv).

{¶65} R.C. 2323.51 uses an objective standard in determining whether sanctions may be imposed for frivolous conduct. (Citation omitted.) *Stevenson*, *supra*, at ¶41. Thus, a finding of frivolous conduct under R.C. 2323.51 is decided without inquiry as to what the individual knew or believed. (Citation omitted.) *Omerza v. Bryant & Stratton*, 11th Dist. Lake No. 2006-L-147, 2007-Ohio-5216, ¶15.

### R.C. 2323.51(A)(2)(a)(iii) and (iv)

{¶66} R.C. 2323.51(A)(2)(a)(iii) involves "conduct [that] consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Similarly, R.C. 2323.51(A)(2)(a)(iv) involves "conduct [that]

17

consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief."

{¶67} The Tenth District has noted that the language of subsection (a)(iii) is similar to the language used in Fed.R.Civ.P. 11(b)(3), which states that, by presenting a pleading to the court, an attorney or unrepresented party certifies that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Carasalina L.L.C. v. Bennett*, 10th Dist. Franklin No. 14AP-74, 2014-Ohio-5665, ¶32, citing Fed.R.Civ.P. 11(b)(3). According to the drafters, the "certification is that there is (or likely will be) 'evidentiary support' for the allegation, not that the party will prevail with respect to its contention regarding the fact." *See* Advisory Committee Notes on the 1993 amendments to Fed.R.Civ.P. 11(b)(3).

{¶68} With respect to what constitutes sufficient "evidentiary support," the drafters stated: "[t]hat summary judgment is rendered against a party does not necessarily mean * * * that it had no evidentiary support for its position. On the other hand, if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient 'evidentiary support' for purposes of Rule 11." *Id*. *See also Merino v. Salem Hunting Club*, 7th Dist. Columbiana No. 11 CO 2, 2012-Ohio-4553, ¶17 ("[T]he fact that Appellant survived summary judgment * * * should be proof that Appellant's claims were not frivolous, even though his evidence ultimately fell short"); *Wrinch v. Miller*, 183 Ohio App.3d 445, 2009-Ohio-3862, ¶55 (9th Dist.) ("Although not determinative, the fact that summary judgment was denied

18

demonstrates that [plaintiff-appellant] provided at least some factual basis to support the claims").

{¶69} We have previously recognized this principle in reviewing a trial court's finding of frivolous conduct under subsection (a)(iii). In *Michael A. Shore Co. L.P.A. v. Estate of Hards*, 11th Dist. Geauga No. 2015-G-0038, 2017-Ohio-7123, we held that a law firm's claim for relief alleging an oral contract for attorney fees was not frivolous. *Id.* at ¶40. Even though the trial court granted summary judgment to the defendant, we noted that the law firm could have "provided some evidence, via, e.g., an affidavit made on personal knowledge" to create a genuine issue of material fact regarding the existence of an oral contract. *Id.*

{¶70} Thus, the Tenth District has construed subsection (a)(iii) to mean that "a party only needs minimal evidentiary support for its allegations or factual contentions to avoid a frivolous conduct finding." *Carasalina* at ¶36. *See Eastwood v. Eastwood*, 9th Dist. Summit No. 25310, 2010-Ohio-6492, ¶15 ("R.C. 2323.51(A)(2)(a)(iii) authorizes the trial court to sanction the filing of a motion only if it has *no* evidentiary support"). (Emphasis sic.)

*Analysis*

{¶71} The trial court found that Ms. Zamlen-Spotts' filing of her complaint and testimony at trial constituted frivolous conduct under R.C. 2323.51(A)(2)(a)(iii) and (iv). Specifically, the trial court determined that during the trial, Ms. Zamlen-Spotts (1) "presented no evidence whatsoever" regarding a physical assault from Ms. Keco "other than her own testimony," and (2) "presented no testimony or evidence from anyone other than herself" that Ms. Keco caused her injuries.

{¶72} The filing of the complaint constituted "conduct" under R.C. 2323.51(A)(1)(a) as the "filing of a civil action", the "assertion of a claim * * * in connection with a civil action," or the filing of a pleading * * * in a civil action." Ms. Zamlen-Spotts' trial testimony also constituted "conduct" under R.C. 2323.51(A)(1)(a) as the "assertion of a claim * * * in connection with a civil action" or "the taking of any other action in connection with a civil action." In addition, both the complaint and testimony consisted of "allegations or other factual contentions" under R.C. 2323.51(A)(2)(a)(iii) and "factual contentions" under R.C. 2323.51(A)(2)(a)(iv). However, the record does not support a finding that Ms. Zamlen-Spotts' complaint and testimony had "no evidentiary support" or were "not warranted by the evidence."

{¶73} The definition of "evidence" is "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact." *Black's Law Dictionary* (11th Ed.2019). Similarly, the trial court instructed the jury that "evidence" includes "testimony received from the witnesses," and that "direct evidence" is "the testimony given by a witness who has seen or heard the facts to which that witness testifies."

{¶74} Ms. Zamlen-Spotts' own testimony, by definition, constitutes "evidence," and it supports the claims for relief set forth in her complaint. There is no legal requirement in a civil case that alleged eyewitness testimony be corroborated by a third party to constitute "evidence." *See Felton v. Felton*, 79 Ohio St.3d 34, 44 (1997) (holding that a witness' eyewitness testimony, standing alone, may be sufficient to establish proof by a preponderance of the evidence). The weight or the preponderance of the evidence

is not determined by the number of witnesses on either side but by the impression which their testimony makes upon the jury, the manner of the witnesses, the circumstances attending the transactions, and the character of the testimony itself. *Rice v. Cleveland*, 144 Ohio St. 299, 302 (1944). As the trial court instructed the jury in this case, "you will assign to the testimony of each witness such weight as you deem proper" after applying "the tests of truthfulness that you are accustomed to apply[ing] in your daily lives."

{¶75} Further, the trial court's determinations are not supported by the trial record and appear to have resulted from an application of a subjective standard rather than the required objective standard. In addition to her own testimony, Ms. Zamlen-Spotts' evidence at trial included: (1) sworn testimony from Ranger Kailburn and Ms. Shumway regarding their personal observations of injuries to her arms on the evening of the alleged physical assault, (2) photographs from Ranger Kailburn depicting the injuries on her arms on the evening of the alleged physical assault, (3) emergency room medical records from the evening of the alleged assault documenting diagnoses of a concussion, acute cervical strain, bilateral shoulder pain, and contusions, (4) sworn testimony from Ms. Jones, who called an ambulance for her the day after the alleged physical assault after speaking to her on the telephone and later observed her physical injuries, (5) medical records from the day after the alleged physical assault when she was taken to the hospital by ambulance, (6) medical records documenting various treatments for her physical and psychological conditions and surgery to repair a type two SLAP tear, (7) testimony from Mr. Simons opining that her acute stress disorder and subsequent posttraumatic stress disorder were caused by the incident on April 14, 2015, and (8) videotaped testimony

from her treating surgeon, Dr. Levy, opining that the SLAP tear was a direct and proximate result of an assault on April 14, 2015.

{¶76} Although the parties did not engage in summary judgment practice prior to trial, Zamlen-Spotts would have likely defeated a motion for summary judgment by properly presenting this evidence pursuant to Civ.R. 56(E).

{¶77} In addition, and critical to our analysis, the trial court denied two motions from Ms. Keco for a directed verdict. Courts have held that a denial of a motion for a directed verdict weighs against a finding of frivolous conduct. *See, e.g., Rossman & Co. v. Donaldson*, 10th Dist. Franklin Nos. 94APE03-338, et al., 1994 WL 694985, \*15 (Dec. 6, 1994) ("[C]laims which withstand a directed verdict have arguable merit and ordinarily are not frivolous"); *Baker v. Beachwood Villas Condominium Owners Assn.*, 6th Dist. Erie No. E-03-11, 2004-Ohio-682, ¶23 ("[T]he trial court's denial of directed verdict at the conclusion of appellant's case-in-chief is at least arguably a determination that appellant's lawsuit is not legally unwarranted").

{¶78} A trial court may not grant a directed verdict unless the evidence, when construed in the light most favorable to the nonmoving party, leads reasonable minds to only one conclusion, and that conclusion is adverse to the nonmovant. (Citation omitted.) *Bliss v. Chandler*, 11th Dist. Geauga No. 2006-G-2742, 2007-Ohio-6161, ¶47; Civ.R. 50(A)(4). In denying the first motion at the conclusion of Ms. Zamlen-Spotts' case and *after* hearing the testimony of Ms. Keco's medical expert who disagreed with Ms. Zamlen-Spotts' orthopedic surgeon as to the cause of the SLAP tear, the trial court acknowledged that "[c]onsidering a motion for a directed verdict would require me to determine based on the evidence I have heard that no reasonable jury could rule in favor of the plaintiff."

22

In denying the second motion at the conclusion of Ms. Keco's defense, the trial court stated:

{¶79} "There will be no directed verdict. After hearing the testimony the Court cannot say that after construing it most strongly in favor of one side or the other that a reasonable jury could come to but one conclusion. So any motions for directed verdict are denied."

{¶80} Although Ms. Keco presented evidence that directly contradicted Ms. Zamlen-Spotts' evidence, the trial court necessarily determined that Ms. Zamlen-Spotts' evidence was sufficient to lead reasonable minds to find in her favor. In fact, the record reflects that the evidence persuaded at least one juror to find in Ms. Zamlen-Spotts' favor on her assault claim. While the jury ultimately found Ms. Keco's evidence to be more persuasive, this does not compel a conclusion that Ms. Zamlen-Spotts' offered *no* evidentiary support for her allegations or that her allegations were not warranted by the evidence.

{¶81} The trial court further based its finding of frivolous conduct on its assessment that Ms. Zamlen-Spotts allegations were "incredible." Some courts have reversed a trial court's finding of frivolous conduct where the trial court's conclusion resulted from weighing the evidence or determining credibility. *See Eastwood*, *supra*, at ¶15 ("Sanctions are not warranted under R.C. 2323.51 merely because [appellant] was unable to persuade the trial court to grant her motion after it weighed the evidence"); *Wrinch*, *supra*, at ¶55 ("While evidence may have been offered at trial to contradict [appellant]'s claims, leaving the jury to weigh the evidence and determine the credibility of the witnesses, neither the presence of conflicting evidence nor an unsuccessful

23

outcome on the claims compel the conclusion that [appellant]'s claims were frivolous"). *See also Estate of Cain*, 10th Dist. Franklin No. 93AP-11, 1993 WL 460584, *4 (Nov. 9, 1993) ("The trial court apparently equated a merit finding of insufficient evidence with an action being frivolous").

{¶82} However, at least two courts have accepted a trial court's determinations where the claimant's allegations were demonstrably false. For instance, in *Nithiananthan v. Toirac,* 12th Dist. Warren Nos. CA2014-02-021, et al., 2015-Ohio-1416, the Twelfth District affirmed a finding of frivolous conduct under subsection (a)(iii) where the defendants filed a counterclaim against the plaintiffs (their neighbors), alleging that they engaged in the unauthorized "filming" and "surveillance" of them. *Id.* at ¶8. The court's decision was based on the magistrate's findings that a defendant's testimony lacked credibility, contained increasingly "exaggerated" assertions, and contained allegations that "had become so florid as to be fantastical." *Id.* at ¶69-71.

{¶83} Further, in *Martell v. Martell*, 5th Dist. Stark No. 2018CA00017, 2018-Ohio-4927, the Fifth District affirmed a finding of frivolous conduct under subsection (a)(iii) where a former spouse filed a motion requesting relief from a decree of divorce and separation agreement based, in part, on her alleged lack of the requisite mental capacity to contract. *Id.* at ¶4-6. In support of her motion, the former spouse filed affidavits from her primary care physician and her therapist that stated she was not competent to enter into a contract. *Id.* at ¶7-8. However, both professionals contradicted their affidavits during their deposition testimony, and counsel did not confer with them before filing the motion. *Id.* at ¶18. The court stated that while the affidavits arguably provided "minimal evidentiary support for her allegations and factual contentions," it was "eliminated" by the

professionals' testimony and "a review of their contemporaneous medical records." *Id.* at ¶50.

{¶84} Ms. Zamlen-Spotts' allegations are distinguishable from those presented in *Nithiananthan* and *Martell*. In *Nithiananthan*, the counterclaimants' allegations regarding their neighbors' surveillance were particularly outlandish, including claims of a "surveillance van" and a floating "globe." *Id.* at ¶71. The court noted that the counterclaimants never presented "any photographs or other evidence to substantiate" the alleged surveillance. *Id.* at ¶72.

{¶85} Here, even if Ms. Zamlen-Spotts' versions of events seem implausible and even exaggerated, she presented photographs and medical records documenting injuries on the day of the alleged physical assault as well as professional opinions that her medical conditions were consistent with and caused by a physical assault on that day. Further, while Ms. Keco presented evidence that contradicted Ms. Zamlen-Spotts' allegations and ultimately persuaded the jury, unlike in *Martell,* Ms. Zamlen-Spotts' allegations were not "eliminated." The defense offered no evidence of a pre-existing condition of her right shoulder or of an accident or injuries occurring before or after the date of this incident that would explain the objective findings of injury.

{¶86} Ms. Keco argues that our decision in *Lozada v. Lozada*, 11th Dist. Geauga No. 2012-G-3100, 2014-Ohio-5700, supports the trial court's finding of frivolous conduct. In *Lozada*, a wife filed a petition for domestic violence civil protection order ("CPO") alleging that her husband threatened her, threatened to take custody of their child, and that she was in fear of him. *Id.* at ¶2. After a hearing, a magistrate denied the petition and found that the wife had made materially false statements in her affidavit, that she was

25

not a credible witness, and that virtually all of her evidence was based on unclear generalizations and unspecified claims. *Id.* at ¶3. The husband then filed for sanctions. *Id.* at ¶4. Based on the evidence presented at the CPO hearing, the magistrate concluded that the wife had engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(i), (ii), and (iii) and awarded the husband attorney fees. *Id.* at ¶6. The trial court adopted the magistrate's finding of frivolous conduct, which we affirmed. *Id.* at ¶7, 70.

{¶87} *Lozada* is distinguishable in two crucial respects. First, we noted that the magistrate's determinations were premised upon its decision in the underlying CPO case. *Id.* at ¶21. We found that the determinations were rendered final when the trial court adopted the magistrate's decision and were accorded preclusive effect when no appeal was taken. *Id.* at ¶15.

{¶88} Second, we expressly limited our holding to the trial court's finding under a different section of the statute at issue. We specifically based our decision on R.C. 2323.51(A)(2)(a)(i), which involves "conduct" that "obviously serves merely to harass or maliciously injury another party to a civil action." *Id.* at ¶23. Although the magistrate had also found frivolous conduct under subsection (a)(iii), we determined that any additional analysis was moot. *Id.*

{¶89} Ms. Keco also argues that our decision in *Law Office of Natalie F. Grubb v. Bolan*, 11th Dist. Geauga No. 2010-G-2965, 2011-Ohio-4302, supports the trial court's finding of frivolous conduct. In *Grubb,* a law firm sued Bolan for unpaid legal fees. *Id.* at ¶2. Bolan filed a counterclaim alleging that Attorney Grubb of the law firm had committed malpractice while representing her in a prior domestic relations case. *Id.* It was later

determined that Attorney Grubb had never met Bolan nor represented her in any previous matter. *Id.* at ¶40.

{¶90} The law firm and Attorney Grubb filed a motion for sanctions against Bolan's attorney under Civ.R. 11 and R.C. 2323.51, which the trial court ultimately denied. *Id.* at ¶12, 16. We reversed the trial court's judgment in part and found the conduct of Bolan's attorney was frivolous under subsection (a)(iii). *Id.* at ¶40. We noted that there was nothing in the record indicating Bolan's attorney attempted to refute or otherwise explain his reasons for leveling the allegations. *Id.*

{¶91} *Grubb* involves a distinguishable type of allegation. In *Grubb*, the counterclaim was based on demonstrably incorrect information, i.e., that an attorney who allegedly committed malpractice had represented the client. Here, Ms. Zamlen-Spotts' claims are based on her alleged eyewitness observations. Even if Ms. Zamlen-Spotts' allegations of physical assault are implausible in light of the contrary evidence, they are not demonstrably false.

{¶92} Ms. Zamlen-Spotts consistently maintained that she was physically assaulted and presented some evidentiary support for this allegation, which is sufficient to avoid a finding of frivolous conduct under subsection (a)(iii) and (iv). *See Radvansky v. W. & S. Fin. Group*, 1st Dist. Hamilton No. C-070470, 2008-Ohio-4472, ¶25 (finding of frivolous conduct under subsections (a)(iii) and (a)(iv) reversed where plaintiff consistently maintained allegation and presented evidentiary support in the form of responses to interrogatories and affidavits). *See also Michael A. Shore Co. L.P.A.*, *supra*, at ¶40 (allegations were not frivolous under subsection (a)(iii) where plaintiff could have provided an affidavit made on personal knowledge).

27

{¶93} The record establishes that Ms. Zamlen-Spotts produced at least "minimal evidentiary support" for her allegations and factual contentions and they were "warranted by the evidence." Thus, the trial court's finding that Ms. Zamlen-Spotts engaged in frivolous conduct pursuant to R.C. 2323.51(A)(2)(a)(iii) and (iv) is not supported by competent, credible evidence.

{¶94} Ms. Zamlin-Spotts' first assignment of error has merit.

**Award of Attorney's Fees and Expenses**

{¶95} Under her second assignment of error, Ms. Zamlen-Spotts contends the trial court erred in ordering her to pay attorney's fees and expenses relating to her prior action against Ms. Keco that she voluntarily dismissed.

{¶96} Because we have determined that the trial court's finding of frivolous conduct was not supported by the record, there was no basis for any sanctions. This assignment of error is overruled as moot.

{¶97} Based on the foregoing, the judgment of the Geauga County Court of Common Pleas is reversed and remanded for determination of costs to be award to Ms. Keco as the prevailing party pursuant to Civ.R. 54(D).

THOMAS R. WRIGHT, P.J., concurs.

TIMOTHY P. CANNON, J., dissents with a Dissenting Opinion.

_____

TIMOTHY P. CANNON, J., dissenting.

{¶98} I respectfully dissent and would affirm the order of the trial court. The trial court sat through all of the pretrial discussions and trial, and it was in the best position to

28

review and consider the request for sanctions. It appears clear the trial court felt strongly that the entire claim of injury was fabricated or, at the very least, incredibly exaggerated and overstated. That being the case, it was within the discretion of the trial court to award sanctions. Based on our highly deferential standard of review in these types of cases, I would affirm.